IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>APPROXIMATELY $3,769.00<br>IN U.S. CURRENCY,<br><br>  Defendant. | Civil No. 4:20-cv-00232<br><br>VERIFIED COMPLAINT FOR<br>FORFEITURE *IN REM* |

Plaintiff, United States of America hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.   NATURE OF THE ACTION

1.   This is an action to forfeit and condemn specific property to the use and benefit of the United States of America ("Plaintiff") due to its involvement in violations of 21 U.S.C. § 846 (attempt and conspiracy) and § 841(a)(1) (prohibited acts).

2.   The United States believes the Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as money or a thing of value furnished or intended to be furnished by a person in exchange for a controlled substance, in violation of subchapter I – Control and Enforcement, of Chapter 13 – Drug Abuse Prevention and Control, and Title 21 – Food and Drugs, of the United States Code, and proceeds traceable to such an exchange, and money used or intended to be used to facilitate any violation of said subchapter.

## II. DEFENDANT *IN REM*

3. The Defendant property is generally described as approximately $3,769.00 in U.S. Currency seized on or about August 9, 2019 in Des Moines, Iowa.

4. The Defendant property is in the custody of the Des Moines Police Department.

## III. JURISDICTION, VENUE, AND PROCEDURAL AUTHORITY

5. This Court has jurisdiction over an action commenced by the United States as Plaintiff, pursuant to 28 U.S.C. § 1345.

6. This Court has original jurisdiction over this action for the recovery or enforcement of a fine, penalty, or forfeiture incurred under an Act of Congress, pursuant to 28 U.S.C. § 1355(a).

7. This Court also has jurisdiction over this action because acts or omissions giving rise to this civil forfeiture occurred in the Southern District of Iowa, therefore, this action may be brought in this District, pursuant to 28 U.S.C. § 1355(b)(1)(A).

8. Venue is proper in this District because this is a civil proceeding for the recovery of a pecuniary fine, penalty, or forfeiture, and is being prosecuted in the District where the action accrues and where the Defendant property is found, as authorized by 28 U.S.C. § 1395(a) and (b).

9. Venue is also generally proper in this District under 28 U.S.C. § 1391(b)(2) because it is where "a substantial part of the events or omissions giving

rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated."

10. The general rules for civil forfeiture proceedings are set forth in 18 U.S.C. § 983.

## IV. FACTS

11. The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

12. The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

13. Schedule I substances have a high potential for abuse, and have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these drugs under medical supervision. 21 U.S.C. § 812(b)(1)(A) – (C).

14. Marijuana, or Cannabis, is a psychoactive drug from the Cannabis plant. The main psychoactive component of cannabis is tetrahydrocannabinol (THC), which is one of the 483 known compounds in the plant, including at least 65 other cannabinoids. Cannabis can be used by smoking, vaporizing, within food, or as an extract. Cannabis has mental and physical effects. It causes a "high," or stoned feeling and other effects, including a general change in thought and perception, difficulty concentrating, impaired short-term memory, altered sense of time,

impaired body movement, relaxation, and an increase in appetite, Marijuana is a Schedule I controlled substance.

15. Schedule II substances have a high potential for abuse, but the drugs or substances have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of Schedule II controlled substances may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2)(A) – (C).

16. Cocaine is a powerfully addictive stimulant drug made from the leaves of the coca plant native to South America. Cocaine acts by inhibiting the reuptake of serotonin, norepinephrine, and dopamine, which causes greater concentrations of these three neurotransmitters in the brain. Cocaine is addictive due to its effect on the reward pathway in the brain. It is commonly snorted, inhaled as smoke, or dissolved and injected into a vein. After a short period of use, there is a high risk that dependence will occur. The mental effects of cocaine may include loss of contact with reality, an intense feeling of happiness, or agitation. The physical symptoms may include a fast heart rate, sweating, and large pupils. Cocaine use increases the risk of stroke, myocardial infarction, lung problems in those who smoke it, blood infections, and sudden cardiac death. The use of high doses can result in very high blood pressure or body temperature. Effects begin within seconds to minutes of use and last between five and ninety minutes. Cocaine has a small number of accepted medical uses, such as numbing and decreasing bleeding during nasal surgery. Cocaine is a Schedule II controlled substance.

17. Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute a controlled substance unless authorized by law to do so. 21 U.S.C. § 841(a)(1).

18. Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions. 21 U.S.C. § 846.

19. The Defendant property is money furnished, or intended to be furnished, in exchange for a controlled substance, proceeds traceable to such an exchange, and/or money used or intended to be used to facilitate a violation of Subchapter I, Part D, Title 21, United States Code, namely, the drug dealing prosecuted in *United States v. Aaron Ramon Jefferson,* 4:18-CR-196 (S.D. Iowa).

20. In approximately 2008, Aaron Ramon Jefferson (Jefferson) was convicted in the Iowa District Court for Polk County of possession of a controlled substance, namely, marijuana and served time in prison for this conviction.

21. In approximately 2008, Jefferson was convicted in the Iowa District Court for Polk County of identity theft, and served time in prison for this conviction.

22. In approximately 2009, Jefferson was convicted in the Iowa District Court for Polk County of possession of marijuana with the intent to deliver, and served time in prison for this conviction. He was caught with over 100 grams of marijuana and a handheld drug scale.

23. In approximately 2010, Jefferson was convicted in the Iowa District Court for Polk County of Theft (third degree), and served time in prison for this conviction.

24. In approximately 2018, Jefferson was convicted in the Iowa District Court for Polk Count of assault, for striking a minor female.

25. Jefferson started using marijuana at age 13, and by age 18 used marijuana daily.

26. Jefferson started using cocaine in his early 30s, and eventually started using it daily, and illegally selling it to other people for a profit.

27. Jefferson was unemployed in 2017 and only worked seasonal employment briefly in 2018, until he was fired. By August 2018, he was unemployed. However, he was illegally working as a drug dealer, specifically dealing cocaine.

28. On August 9, 2018, the Des Moines Police Department (DMPD) responded to a call for service from EM at 3630 Twana, Apt. 8, Des Moines, Iowa.

29. EM claimed when she and Jefferson, her next-door neighbor, were out on their porches, he pointed a rifle with a flashlight attached to the barrel at her.

30. EM explained that she and Jefferson had an ongoing dispute regarding Jefferson's dog harassing her dog.

31. A DMPD officer knocked on Jefferson's door, to investigate what had happened.

32. Jefferson answered the door, and spoke to the officer through the cracked door.

33. Jefferson confirmed he had argued with EM, and admitted he had been on the porch with a rifle, claiming he was showing it to his friend. He denied pointing it at EM.

34. Thereafter, an officer asked Jefferson for his identification.

35. Jefferson closed the door and went into the apartment supposedly to find it.

36. Due to safety concerns based on the allegation of a firearm, the officer opened the door to see what was transpiring, but did not enter the residence.

37. Jefferson's wife, CC, closed the door, but the officer again opened it as a precaution.

38. Jefferson returned to the porch, and said he could not find his identification. He added he wanted to go to his car to look for it.

39. The officer then asked Jefferson to simply tell him his name.

40. Jefferson refused and attempted to go to his car.

41. Jefferson was handcuffed at this time and taken to a patrol car.

42. CC and a friend, RW, remained inside the apartment with another officer.

43. During this encounter, officers smelled the pungent odor of marijuana wafting out of the apartment.

44. While Jefferson was handcuffed in the police car, two other officers arrived.

45. In response to questions regarding the marijuana smell, Jefferson admitted to possessing user quantities of marijuana.

46. It is illegal to possess marijuana under state and federal law, subject to limited exceptions not here applicable.

47. An officer explained to Jefferson that, based on the smell of marijuana and other circumstances, law enforcement would get a "user warrant" authorizing seizure of personal use quantities of marijuana.

48. The officer explicitly told Jefferson that, if other contraband was found during the execution of a "user warrant" the police "would not look the other way."

49. The officer also advised Jefferson he could sign a consent to a search, which would be less of a hassle.

50. Jefferson ended up signing a consent to search form, in which he knowingly agreed to allow the police to search his residence.

51. Jefferson was explicitly instructed that he was going to accompany officers during the search and that he could revoke consent at any time.

52. Jefferson escorted officers into the apartment, went to his bedroom and got a plastic container with over 40 grams of marijuana inside it.

53. In the living room, officers found:

- a rifle box and manual in plain view; and

- a loaded Taurus, Model PT111 (G2 Millennium), 9mm pistol (S/N: TKS29119), with one round in the chamber.

54. In Jefferson's bedroom, officers located:

- an unloaded Romarm/Cugir, 7.62 x 39 millimeter, semi-automatic Draco rifle (S/N: DB721118RO) with a missing cover over the spring assembly;
- two magazines (one empty and one containing 30 rounds);
- digital drug scales;
- a plastic container containing 94.56 grams of cocaine;
- assorted pills, including ecstasy and alprazolam;
- plastic baggies;
- an unloaded DPMS (Panther Arms), A-15 rifle (S/N: FFH197860);
- a black body armor vest with two black masks; and
- a safe.

55. The Defendant property, $3,769.00 in U.S. Currency, was recovered from a search of Jefferson, who was then unemployed.

56. This $3,769.00 was the proceeds of Jefferson's drug dealing.

57. An officer with the narcotics unit responded after the discovery of the large quantity of cocaine. He conducted recorded, post-*Miranda* interviews of all three occupants, who knowingly and voluntarily agreed to be interviewed.

58. Jefferson explained he and his wife and daughter had just moved into the apartment about a week ago. They are the only ones with keys to the apartment.

59. Jefferson claimed an unidentified friend had come to the apartment with a rifle so Jefferson could put an attachment on it. Jefferson stated that he was outside with the rifle and a neighbor who does not like him called the police.

60. Jefferson claimed he only had an ounce of marijuana and that it was for his personal use.

61. Jefferson said he buys a ¼ pound of marijuana at a time every couple of weeks, but did not want to tell law enforcement how much he paid for his marijuana.

62. Jefferson said he had been unemployed for less than a year and was then trying to get disability for narcolepsy. CC, his wife, worked at Methodist Hospital in Des Moines.

63. Jefferson said he smokes a ¼ ounce of marijuana a day due to his narcolepsy.

64. Jefferson admitted using ecstasy and cocaine for personal use.

65. Jefferson said he only buys an ounce of cocaine at a time and pays $1,000 dollars for it.

66. Jefferson stated that he does not sell any marijuana but he has shared it, if a friend comes over.

67. Jefferson stated that he buys drugs in bulk and just sits on it.

68. Jefferson stated the marijuana, ecstasy, and cocaine were also his.

69. Jefferson stated that sometimes he can do an eight ball of cocaine in a day (3.5 grams). Jefferson stated that his fingerprints and DNA wouldn't be on the drugs because he uses gloves when he touches them so the drugs do not soak through his pores. Jefferson does this so he does not get too high.

70. Jefferson stated the guns recovered in the residence belonged to his wife and a friend.

71. Jefferson stated the cash recovered on him was for a down payment on a house and that he does not trust banks so he was holding onto it. He then changed his story and said he was going to deposit it tomorrow in his account.

72. Jefferson stated that the extra baggies are in case he is going to go somewhere so he does not have to take all his drugs with him.

73. CC claimed the money that was recovered from Jefferson was from selling personal items when they moved.

74. CC stated that she had no knowledge about the amount of narcotics recovered in the apartment and that she had seen a scale, but it was there so Jefferson did not get ripped off by other people.

75. On September 18, 2018, law enforcement executed a federal search warrant on the locked safe that was seized from Jefferson's residence during the consent search that occurred on August 9, 2018.

76. In the safe, officers recovered the following:

- A Sturm, Ruger & Co., LCP II, .380 caliber pistol, serial number 380238540;

- A Smith & Wesson, M&P Bodyguard 380, .380 caliber pistol, serial number KEB2469;

- $2,400.00;

- Ammunition; and

- Jefferson's Social Security Card, birth certificate, and a marriage certificate for Jefferson and CC.

77. On November 5, 2018, U.S. Probation Officers conducted a home check of Jefferson's residence at 5701 Washington Avenue.

78. When the probation officers arrived, Jefferson's 13-year-old daughter was in the driveway.

79. Upon seeing the probation officers, she immediately went into the house and shut the door.

80. When the probation officers got to the front door, which was a glass security door, a probation officer saw a white male crouching on the floor in front of the couch.

81. The same probation officer also saw Jefferson making furtive movements behind the couch.

82. In front of the couch, where the white male had been crouched, the same probation officer saw a razor blade on the floor, as well as a small tube, metal tool, and white powder residue, namely, cocaine residue.

83. The same probation officer asked Jefferson if he could look behind the couch and Jefferson agreed.

84. Behind the couch, the same probation officer located a plastic baggie with a white powdery substance, namely, cocaine.

85. The probation officers requested assistance from the DMPD.

86. A patrol officer responded first and then a Narcotics Unit Investigator arrived.

87. The DMPD officers weighted the white powdery substance in the baggie that was located behind the couch (75 grams) and it tested field-tested positive for cocaine.

88. After Jefferson denied consent to further search the residence, the DMPD obtained a valid state search warrant.

89. During the search, officers located the following items in the living room:

- A silver Apple iPhone;

- An estimated one gram (1g) of loose marijuana and a black marijuana "grinder";

- An "operational" working digital scale, which tested positive for the presence of cocaine;

- A rifle optic and a WD40 "hide can" that tested positive for the presence of cocaine;

- Miscellaneous drug paraphernalia items;

- Glass mirror with cocaine residue (positive field test), small tube, razor blade and small metal tool;

- A plastic container with an estimated three grams (3g) of marijuana;

- A box of sandwich baggies;

- Heat seal packaging with cocaine residue; and

- A glass jar containing a trace amount of marijuana.

90. During the search, officers located the following items in the southwest bedroom:

- A Ruger 9mm pistol magazine with fourteen (14) round capacity;

- Another safe in the closet;

- $8,500.00 in U.S. currency; and

- Three (3) "functioning" digital scales with a white residue, a baggie of rubber marijuana wax containers, a baggie of miniature Ziploc baggies and a box of sandwich baggies.

91. During the search, officers located the following items in the basement:

- A green "PMAG 30" rifle magazine; and

- A miniature Ziploc baggie containing a trace amount of white powder.

92. During the search, officers located the following items on Jefferson and CC: $200.00 in U.S. currency, and $556.00 in U.S. currency he handed to her.

93. Firearms and ammunition, scales, plastic baggies, drug paraphernalia, and cash are all tools of illicit drug dealing and indicia of drug trafficking.

94. On September 25, 2018 and November 27, 2018, Jefferson was charged in the U.S. District Court for the Southern District of Iowa with possession with the intent to deliver cocaine, illegally possessing a firearm, and illegally possessing a firearm in furtherance of a drug trafficking crime.

95. On February 21, 2019, Jefferson, with the advice and consent of competent counsel, entered into a Plea Agreement with the federal government.

96. In Jefferson's Plea Agreement, he agreed to possessing cocaine with the intent to distribute it on August 9, 2018 and November 5, 2018. He also admitted he possessed one or more firearms in furtherance of his drug trafficking.

97. In his Plea Agreement, Jefferson consented to forfeit unspecified U.S. currency identified in the Superseding Indictment as drug money, and agreed to waive all challenges to any forfeiture carried out pursuant to the Plea Agreement. More specifically, Jefferson agreed to "waive all interest in asset[s] subject to this

Plea Agreement in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal." The government proceeded to criminally forfeit the $2,400.00 seized from Jefferson's safe and the $9,256.00 seized from his residence.

98. Jefferson acknowledged the seizure of the Defendant property, namely, $3,769.00 in U.S. Currency, in his Sentencing Memorandum filed June 20, 2019.

99. This judicial forfeiture seeks to forfeit the remainder of the drug money seized from Jefferson, as he expressly and/or implicitly agreed to in his Plea Agreement.

100. Jefferson plead guilty to these charges on February 22, 2019.

101. Jefferson was sentenced on June 24, 2019 to one hundred twenty (120) months in federal prison, followed by three (3) years of supervised release.

102. During his sentencing hearing, Jefferson admitted he got into drug dealing as a vocation. "I got into drug dealing, you know, with my family in mind, to support them and try to better our lives, albeit that it was, you know, misguided."

103. During his sentencing hearing, Jefferson admitted he used tools of the drug dealing trade, saying "I had weapons to protect myself for my newfound wealth from drug dealing."

104. The Defendant currency was part of this wealth.

105. Jefferson's ability to accumulate large amounts of cash in a short period of time by drug dealing concerned the sentencing court, and was a factor at sentencing.

106. The seized $3,769.00 was discussed at the sentencing hearing by the Court as part of the "seizure of his original drug operation."

107. In 2018 – 2019, Jefferson's net worth was self-reported to the U.S. Probation Office as negative $44,327.92, with his only asset being a 2011 Buick automobile. He did not claim the Defendant property belonged to him.

### V. COUNT ONE – DEFENDANT $3,769.00
### (FORFEITURE UNDER 21 U.S.C. § 881(a)(6))

108. Plaintiff repeats and realleges each and every allegation set forth above.

109. A preponderance of the evidence proves that the Defendant property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841 and § 846 et seq.

110. As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(6).

### VI. CLAIM FOR RELIEF

WHEREFORE, the United States prays that the Defendant property be forfeited to the United States and that it be awarded its costs and disbursements in this action and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

Marc Krickbaum
United States Attorney

By:   /s/ Craig Peyton Gaumer
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Courthouse Annex, Suite 286
110 East Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9317
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, John J. Scarlett, hereby verify and declare under penalty of perjury that I am an Officer with the Des Moines Police Department, and that I have read the foregoing Verified Complaint and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and other law enforcement agencies working in this matter, including information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as an Officer with Des Moines Police Department.

Dated: July 27, 2020.

_____ #4851
John J. Scarlett, Officer
Des Moines Police Department